UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
                                                                      :
PATRICIA KLOS,                                                        :          09-CV-3039 (ARR)
                                                                      :
                                    Plaintiff,                        :          NOT FOR PRINT OR
                                                                      :          ELECTRONIC
          -against-                                                   :          PUBLICATION
                                                                      :
MICHAEL J. ASTRUE,                                                    :          OPINION AND ORDER
Commissioner of Social Security,                                      :
                                                                      :
                                    Defendant.                        :
                                                                      :
-------------------------------------------------------------------- X
ROSS, United States District Judge:

        Plaintiff Patricia Klos, proceeding pro se, commenced this action pursuant to the Social

Security Act, 42 U.S.C. § 405(g).  She seeks review of a decision by the Commissioner of the

Social Security Administration (the "SSA"), denying her claims for Disability Insurance Benefits

under the Social Security Act (the "Act").  The Commissioner moved for judgment on the

pleadings affirming that plaintiff is not entitled to Disability Insurance Benefits under the Act.

Plaintiff responded in opposition, and the court construes her pro se submissions as a motion

seeking reversal of the Commissioner's decision and an order awarding her benefits.  For the

reasons set forth below, the court grants the Commissioner's motion and denies plaintiff's

motion.[1]

_____

        [1] Plaintiff's motion for appointment of counsel, Dkt No. 11, is also denied because
plaintiff has not made an adequate showing that appointment of counsel is warranted in this
matter.  Plaintiff had the benefit of counsel during her hearing before the ALJ and when her
application for benefits was reviewed by the Appeals Council.  This court has considered the
arguments made by plaintiff's previously retained counsel to the Appeals Council as well as
plaintiff's pro se arguments in the instant matter.

# PROCEDURAL HISTORY

On December 26, 2005, plaintiff filed an application for Disability Insurance Benefits ("DIB"), claiming that she has been disabled since March 17, 2000 due to cervical dystonia, agoraphobia, depression, scoliosis, osteoporosis, hypothyroidism, endocarditis, acid reflux, high cholesterol, and a right kidney impairment. (R. 20, 59, 67, 70.) Plaintiff's application was denied on May 17, 2006. (R. 48-52.) She then requested a hearing before an Administrative Law Judge ("ALJ"), which was held by video teleconferencing before ALJ Katherine Edgell on February 28, 2007. (R. 20, 28-29.)

In a letter brief submitted one day prior to the hearing, plaintiff's attorney, Jason Miller from the law offices of Binder and Binder, requested an amendment of the disability onset date to November 1, 2005. (R. 119-20.) The letter brief contained an admission that plaintiff did not receive any medical treatment between March 2002 and March 2005 – according to plaintiff she received no medical treatment during this time because she was terrified to leave her house – and that plaintiff's medical treatment from March 2005 to June 2005 concerned her Mallory-Weiss tear, which she was not claiming was disabling. (R. 119-20; see also R. 199.) At the hearing, the ALJ stated that she had received the letter from plaintiff's attorney and she orally ruled that she had amended the alleged onset date to November 1, 2005 as requested. (R. 411.)

On March 21, 2007, ALJ Edgell issued an opinion finding that plaintiff has not been under a disability within the meaning of the Act from March 17, 2000 through December 31, 2005, the date plaintiff was last insured.[2] (R. 17, 20-26, 411.) Plaintiff requested review, and the

---

[2] The ALJ's decision twice finds that plaintiff's date last insured is December 31, 2005, see R. 22, but also twice states that her date last insured is December 1, 2005, see R. 20, 26. Other evidence in the record confirms that December 31, 2005 is in fact the correct date last

Appeals Council denied her request on July 20, 2007.  (R. 13-16.)  The ALJ's decision thus

became the final decision of the Commissioner on that date.  On July 7, 2009, plaintiff filed this

lawsuit seeking review of the final decision.[3]  (Compl.)

## FACTUAL BACKGROUND

I.    Non-Medical Evidence Before the ALJ

Plaintiff was born on May 1, 1951.  (R. 27, 59, 413.)  She graduated from high school in

1968.  (R. 75, 414.)  She was born in England and moved to the United States in 1984.  (R. 413.)

She is about 5'1" or 5'2" and, at the time of her hearing, she weighed 98 pounds, down from 110

at the time she worked.  (R. 413.)  She is separated from her husband Thomas P. Klos, but they

live in the same apartment.  (R. 61, 77.)  Plaintiff's daughter comes to the apartment about two or

three times a week to help plaintiff.  (R. 428.)  She has not driven a car since 1998 and was

driven to her hearing by her husband.  (R. 414.)

Plaintiff worked full-time first as a bank teller and most recently as a bank manager at

Reliance Federal Savings Bank in Melville, N.Y., now North Fork Bank, for fifteen years, from

April 1985 to March 17, 2000.  (R. 71, 88, 116, 414.)  Her last job title was assistant vice

president, branch manager, a position she held for eight years.  (R. 415-16.)  Her job

responsibilities included opening and closing the bank, providing customer service, arranging

staff scheduling, supervising fourteen people, hiring and firing employees, and preparing daily,

weekly, and monthly reports for the main office.  (R. 71-72, 89, 414-18.)  On a written form,

---

insured.  (R. 67, 119, 411.)  The Commissioner's brief confirms that December 31, 2005 is
plaintiff's date last insured.  See Def's Mem. at 1-2.

[3]  Plaintiff filed this action after the Appeals Council granted her an extension of time
until July 8, 2009 to file this action.  (R. 5.)

plaintiff asserted that the job entailed six hours of walking per workday, six hours of standing per workday, and two hours of sitting per workday.[4] (R. 71.) At her hearing before the ALJ, plaintiff described that in a normal day she spent half of the day seated at a desk and half of the day standing and/or walking. (R. 417-18, 421.) The job also involved writing, typing, or handling small objects, and lifting and carrying "about maybe five or ten pounds" on a normal day. (R. 72, 89, 418.) But sometimes plaintiff would be required to carry the safe deposit boxes, which could be about ten or fifteen pounds, and one day per year plaintiff was involved with purging retained records which required heavy lifting but plaintiff "used to make sure they were no bigger than like 10 pounds or something so I could manage those." (R. 418, 421-22.)

In December 2005, plaintiff completed a disability report in which she asserted that her illnesses first bothered her in March 1993, but she continued to work despite her illnesses until March 17, 2000 when she became unable to work on account of her "disabling conditions." (R. 70-71.) However, the record also contains evidence that plaintiff chose her last day of work. She testified at her hearing before the ALJ that she worked at Reliance Bank until North Fork took it over and gave her a "buyout" of one year severance pay, see R. 416, 419, and she wrote on a submitted form that "when the bank was taken over and I was given the opportunity for early retirement, I took it." (R. 91.)

In her December 2005 disability report, plaintiff described herself as in "constant pain" and unable to "exert myself or concentrate," and she added that her ability to work is limited by her "fear [of] leaving my house." (R. 70.) In another written form, completed in February 2006,

---

[4] On a different form, plaintiff wrote that the job entailed two hours of walking per workday, one hour of standing per workday, and one hour of sitting per day. (R. 89.)

she described the pain as "constant," "unbearable," and "stabbing," and she detailed that she feels the pain on her left side, from her head down into her trapezius muscle, spreading into her left biceps, forearm, thumb, and fingers.  (R. 85, 87.)  In the February 2006 form she also described that "as my condition progressed I was finding it harder to deal face to face with people."  (R. 91.)

During her February 2007 hearing, plaintiff testified that "the main reason" she is claiming disability and cannot work is that her dystonia causes pain in her neck and left shoulder and she has no strength in her left arm.  (R. 422.)  She described that the symptoms have "gotten worse" since 2000.  (R. 422.)  She testified that she takes Advil for her pain and also places her hand on the back of her head to relax her muscle and relieve pain in her neck.  (R. 423.)  Plaintiff first testified that she had not seen any doctor since 2002 for her pain, but remembered that she had seen a doctor in November 2005 who prescribed her Baclofen, which did not work.  (R. 423-24.)  She then admitted that she had not seen any doctor between November 2005 and the February 2007 hearing, but followed the testimony with contradictory testimony that she eventually saw a Dr. Blum in July 2006 and January 2007, who referred her to a pain specialist and a physical therapist but she had not yet seen either specialist.  (R. 424-25; see also R. 117.)  She testified that Dr. Blum prescribed Lexapro to calm her nerves, and "I haven't been on it very long but it's pretty good." (R. 425-26.)  She testified that she had previously taken Prozac and then Paxil in 2002, prescribed by Dr. Marin.  (R. 426.)  She also clarified her medical records by explaining that it was in 1997 or 1998 when she received Botox injections to treat her cervical dystonia.  (R. 433.)

She also testified that she cannot go outside on her own because she cannot see where she is walking and needs assistance on stairs. (R. 423.) She testified that "for a couple of years," since the pain in her neck got worse, "every time I have to leave the house, I get so nervous, I start throwing up." (R. 425.) She testified that she only leaves her apartment to go to her daughter's house located six blocks from her apartment and she only goes to her daughter's house when her daughter walks her there. (R. 429.) However, she also testified that she made trips to England to visit her family in August 2001 and in 2004 for Christmas staying into early January. (R. 426, 434.)

At the hearing, plaintiff admitted to smoking cigarettes and drinking alcohol "sometimes at night if the pain is very bad." (R. 426.) She admitted that when she first stopped working she drank a lot to help relieve and relax the pain in her neck, but "then it messed [her] stomach up." (R. 426-27.) As a result, since 2005 she has decreased her alcohol consumption, explaining that "if I've had a hard day, had a stressful day, then I'll have a glass. I don't have a glass every night." (R. 426-27.)

Plaintiff testified at the hearing that she does not eat meals during the day because she cannot stand up long enough to make meals for herself. (R. 428.) She eats only one meal a day, dinner, prepared by her husband. (R. 428.) She also testified that her husband does all of the housework, including cleaning and laundry. (R. 428-29.) She testified that she can sit for a couple of hours before she must get up and walk around, that walking makes her neck worse, that standing still hurts her spine, and that the heaviest item she can carry with her two hands is a soda bottle. (R. 430-31.) She testified that she plays games on the computer about three or four days a week, but when she plays games on her computer she can only use one hand and she

cannot look straight ahead at the computer but must have the computer on her side.  (R. 430, 432.)  She testified that she cannot work because "I couldn't sit still long enough and I couldn't, you know, I couldn't do my job."  (R. 433.)  She testified that dealing with the public would be "very difficult because I wouldn't be able to look at them directly."  (R. 433.)

Some of plaintiff's testimony was at odds with answers she provided to the Division of Disability Determinations in February 2006 in a written questionnaire.  (R. 77-91.)  In February 2006, plaintiff wrote that she is able to do "light housework with periods of rest" such as dusting, tidying, cleaning the bathroom, ironing, and laundry; prepare sandwiches or microwave dinners; use the computer as she "go[es] online almost daily," and watch TV.  (R. 77-81.)  However, she asserted that she cannot walk straight, read, write, exercise, hold down a good job, communicate with others, shop, drive, and go outside alone, and she has difficulty sleeping.  (R. 78.)  She asserted that she "can no longer read because [her] neck keeps going off to the left and [she] keep[s] re-reading the same line over and over again."  (R. 81.)  She explained that tremors in her left hand leave her unable to grasp and "some days my tremors are so bad that I cannot write [with her right hand]."  (R. 81, 86.)  She wrote that she is unable to handle heavy pots and pans in the kitchen and needs assistance taking laundry to the downstairs laundry room.  (R. 79-80.)

Plaintiff also wrote on the questionnaire: "I no longer go out or socialize because my condition is an embarrassment, and I can't see anything on my right side so I tend to crash into things and knock things over.  I also have a tendency to panic in crowds."  (R. 82.)  She checked off a box that she cannot go out alone, and she explained that she "cannot walk straight because [her] neck is so far off to the left that I can't look to the right or down at the sidewalk."  (R. 80.)

She admitted that she drank alcohol to relax her muscles and ease pain, but she "got

complications from using alcohol and had to stop." (R. 87.)

In 2007, plaintiff completed paperwork informing the SSA that she was currently taking

the following medications prescribed by Dr. Daniel Blum: Lexapro (for anxiety and depression),

Levothroid (for her underactive thyroid and double the dose of Synthroid), and Omeprazole (a

substitute for Protonix to control severe acidity of the stomach). (R. 117.)

II.    Medical Evidence Before the ALJ[5]

    A.    Treating Sources

        1.    Medical Evidence Prior to Plaintiff's Initial Alleged Disability Onset Date
           of March 17, 2000

From January 1, 1999 to March 27, 2002, plaintiff was treated at Patients First Family

Medical Care in Bayside, New York ("Patients First"), primarily by Dr. Glenn E. Marin. (R. 93;

122-76.) Plaintiff's treatment records are difficult to read. As far as the court can discern, on

August 12, 1999, plaintiff visited Patients First, complaining that she fell and twisted her left foot

the week before and was experiencing pain and numbness in her foot. (R. 144.) Her doctor

---

[5] This recitation of medical evidence includes only the evidence before the ALJ for
review. As discussed in greater detail below, plaintiff's submission in opposition to defendant's
motion for judgment on the pleadings states that the medical records from Dr. Glenn Marin were
double-sided and that the Social Security Administration erred by only including one-side of the
double-sided pages in the administrative record. See Pl.'s First Mem. In Opp. at 1-2. Defendant
has replied that: "[A]ccording to the Social Security Administration Office of Disability
Adjudication and Review ("ODAR"), the missing 'front' pages submitted by plaintiff are not in
plaintiff's claims file from which the certified administrative record was prepared. It appears that
a photocopying error was made by the source that submitted plaintiff's medical records to the
State agency. . . . [T]he omission of those pages from the certified administrative record was not
the fault of the Commissioner." Def.'s Reply Mem. at 2 (internal citations omitted). This
recitation of medical evidence includes only the evidence that was in plaintiff's DIB claim file. I
address the question of whether the case must be remanded for consideration of the new evidence
in a later section of this opinion.

noted swelling of her left ankle and tenderness in her foot. (R. 144.) The treatment record from that date includes a notation that plaintiff had anxiety, and the medications Prozac and Valium were listed under the anxiety notation. (R. 144.) On August 17, 1999, plaintiff returned to the doctor and complained of continuing pain in her left foot. (R. 143.) On December 30, 1999, plaintiff visited Patients First, complaining that she tripped and injured her left hand and she was experiencing hand pain and spasms. (R. 142.)

On January 18, 2000, plaintiff returned to Patients First because of intolerable pain in her left hand, numbness in her fingers, and red lesions on her skin. (R. 141.) The doctor noted that plaintiff reported drinking two to four beers daily and had jaundice. (R. 141.) On that same day, plaintiff had laboratory blood tests taken, which revealed high levels of cholesterol (233) and triglycerides (271). (R. 144.) On February 15, 2000 plaintiff returned to Patients First and the treatment notes indicate that plaintiff reported an increase in panic symptoms and palpitations. (R. 141.) On March 16, 2000, plaintiff reported to her doctor that she was experiencing anxiety and panic attacks, despite being on Prozac. (R. 139.) She was prescribed Paxil to take instead of Prozac. (R. 139.)

2.      Medical Evidence After Initial Alleged Disability Onset Date of March 17, 2000

Plaintiff continued to have regular appointments at Patients First until March 27, 2002. On August 1, 2000, plaintiff complained of a cough. (R. 141.) She also complained of severe anxiety and her prescriptions for Paxil and Valium were refilled. (R. 141.)

On December 1, 2000, plaintiff underwent blood testing at Patients First. (R. 137, 172.) The tests revealed high levels of mean cell volume (99), mean cell hemoglobin (33.5), calcium (11.5), and direct bilirubin (.4). (R. 172.) Her cholesterol was normal at 189. (R. 172.)

On January 24, 2001, plaintiff visited Patients First with no complaints to report and to have a pap smear and bone density test done.  (R. 136.)  Plaintiff's bone density was measured using dual-energy x-ray absorptiometry (DEXA).  (R. 147.)  Her DualFemur T-score of -3.1 as well as her AP Spine T-Score of -3.4 indicated osteoporosis.  (R. 147.)  According to the test results report, plaintiff's "present fracture risk is very high."  (R. 147.)  In addition, her DualFemur Z-Score of -2.2 and her AP Spine Z-Score of -2.6 was considered "very low" for her age and sex and "causes of secondary bone loss should be investigated."  (R. 147.)

 On February 23, 2001, plaintiff visited Patients First with no complaints but said she feels tired.  (R. 135.)  The treatment notes from plaintiff's March 23, 2001 appointment are illegible.  (R. 134.)  On May 23, 2001, plaintiff exhibited symptoms of anxiety, panic attacks for which she was taking Valium, spastic torticollis, and hypothyroidism.  (R. 133.)  On May 30, 2001, plaintiff complained of a cough.  (R. 132.) On June 6, 2001, plaintiff complained of congestion of her eyes and nose, but felt better.  (R. 131.)  The doctor noted that she has hypothyroidism.  (R. 131.)  On September 24, 2001, plaintiff complained of coughing and underwent lung capacity testing, which appeared normal.  (R. 129, 159.) Her estimated lung age was 48 years (a younger age than her current age), her risk of chronic obstructive pulmonary disease ("COPD") was four percent, and her risk of COPD if she stopped smoking was two percent.  (R. 159.)  On October 8, 2001, plaintiff complained of a cough and mild wheezing with physical activity.  (R. 128.)  The doctor noted plaintiff's history of hypothyroidism, panic reactions, and osteoporosis.  (R. 128.) On October 24, 2001, a treatment note indicated plaintiff had hypothyroidism, and on November 7, 2001, a treatment note indicated plaintiff had hypothyroidism and fatigue.  (R. 126-27.)  On November 21, 2001, plaintiff complained of a sore

10

throat, difficulty swallowing, a cough, and hypothyroidism. (R. 125.) She tested negative for strep throat. (R. 152.) On February 20, 2002, plaintiff displayed symptoms of hypothyroidism for which she was taking Synthroid, and panic attacks. (R. 124.)

On February 26, 2002, plaintiff was taken by ambulance to the emergency room at New York Hospital Medical Center of Queens after overdosing on Valium and alcohol. (R. 362-78.) At the hospital, plaintiff reported that she was arguing with her husband, and her neck was hurting her, so she threatened to "solve" the problem, and took four pills of Valium while drinking alcohol. (R. 365, 367, 372.) She first complained of depression, suicidal thoughts, and wanting to "escape." (R. 365.) She reported a past history of depression and recent alcohol use. (R. 365.) However, other records from the hospital indicate that she denied suicidal ideation and that she stated that "[i]t was a silly [thing] to do." (R. 367.) She was first assessed as having a depressed affect and suicidal ideations and the psych department was called. (R. 366-67.) Plaintiff was evaluated by Dr. W. Cohen of the psychiatry service, who found no evidence of suicidal ideations, assessed plaintiff with adjustment disorder, and rated her Global Assessment Functioning ("GAF") at 90. (R. 372.) Dr. Cohen also assessed plaintiff as oriented times three, cooperative, pleasant mood, having clear and coherent thoughts, no delusions, no hallucinations, and no suicidal ideations. (R. 372.) Plaintiff told Dr. Cohen that she was not suicidal (as did plaintiff's daughter) and that her taking four Valium with alcohol was an attention seeking act to make a statement during her argument with her husband, while she was drunk. (R. 372.) She also reported to the doctor that she takes Paxil for her panic attacks, but the panic attacks are "totally controlled" with medication. (R. 372.) Dr. Cohen discussed with plaintiff the importance of therapy and then plaintiff was discharged to her daughter's care. (R. 372.)

On March 2, 2002, plaintiff was seen at Patients First, complaining of pain in her scalp, hypothyroidism, and depression for which she was taking Paxil. (R. 123.) She reported that she had been in the hospital. (R. 123.) On March 27, 2002, plaintiff was treated at Patients First, and the treatment notes indicate that plaintiff was taking Paxil and her blood tests indicated elevated liver function, which was due to drinking. (R. 122.)

On October 11, 2002, plaintiff went to the emergency room at New York Hospital Medical Center of Queens, complaining of pain in her left side rib cage area that worsened with motion, deep breathing, and touch. (R. 379-86.) An x-ray of her left rib revealed no evidence of fracture. (R. 386.) She received a physical exam and a neuro/psych exam and was assessed as oriented times three, having a normal mood and affect, and having no motor or sensory deficits. (R. 382.) The hospital records contain a notation that she has a history of dystonia, osteoporosis, and hypothyroid. (R. 381, 384.) She was discharged after she was advised to follow up with her doctor and take Motrin for pain. (R. 383.)

The record contains no evidence that plaintiff again sought medical treatment of any kind until March 2005. On March 4, 2005, plaintiff was taken to the emergency room at New York Hospital Medical Center of Queens after she vomited blood and complained of abdomen pain. (R. 314-54.) Plaintiff admitted that she had been drinking alcohol. (R. 320.) A chest x-ray revealed unremarkable cardiovascular structures, clear lung fields, and no significant abnormality. (R. 271.) A physician noted that doctors must rule out erosive esophagitis and Mallory-Weiss tear, which is a tear in the mucous membrane of the esophagus. (R. 341.) An endoscopy confirmed a Mallory-Weiss tear. (R. 345, 351, 181.) Plaintiff was discharged with instructions to follow-up with a doctor and to get a psychiatric evaluation, alcoholic's anonymous

group counseling, and alcohol detoxification. (R. 324.) During her hospital stay plaintiff reported that she had a history of osteoporosis, dystonia, and hypothyroidism. (R. 316-17, 320.)

The record contains undated "patient intake evaluation" forms that directly follow a New York Hospital Medical Center of Queens "permission for general admission" release form signed and dated on April 1, 2005. (R. 229-41.) The patient intake form notes that plaintiff reported that she has a medical history of panic attacks but her last panic attack was two years ago, in 2003. (R. 233.) Another hospital form dated April 1, 2005 indicates that plaintiff was independent in activities of daily living. (R. 357.)

On April 6, 2005, plaintiff underwent a CT-scan of her abdomen and pelvis. (R. 283-84.) The scan revealed (1) relatively severe fatty infiltration of the liver which is heterogeneous, (2) probable cholelithiasis, and (3) dilation of the collecting systems of the right kidney with a double collecting system. (R. 283-84, 286.) A followup ultrasound was recommended. (R. 287.) The record does not contain any indication that plaintiff had a followup ultrasound.

On April 13, 2005, plaintiff visited the primary care clinic at New York Hospital Medical Center of Queens. (R. 245.) She reported that she had stopped drinking alcohol in March (of 2005). (R. 245.) She also reported that she stopped taking the medications Synthroid, which she had been taking for her hypothyroidism, and Fosamax, for her osteoporosis. (R. 246.)

On April 19, 2005, plaintiff underwent echocardiography, which revealed normal left and right ventricular size and function, normal left and right atrial dimensions, mild mitral regurgitation, and mild tricuspid regurgitation. (R. 282.) On April 25, 2005, plaintiff had a Dexa Scan to evaluate her bone mineral density. (R. 270.) The evaluation revealed "abnormal BMD

AP Spine L1-L4 and dual femurs consistent with osteoporosis." (R. 270.) The radiologist opined that fracture risk is high and treatment is recommended. (R. 270.)

On May 31, 2005, plaintiff was seen in the gastrointestinal clinic at New York Hospital Medical Center. (R. 248.) The treatment notes indicate that plaintiff had osteoporosis, hypothyroidism, torticolysis, high cholesterol, and alcohol abuse which resulted in the March 4, 2005 Mallory-Weiss tear. (R. 248-49.) Plaintiff reported that she was doing well on the medication Protonix for her acid reflux, but she was experiencing poor appetite. (R. 248.) Plaintiff was scheduled to have a colonoscopy. (R. 249.) Plaintiff underwent the colonoscopy on June 22, 2005. (R. 178-79, 211-25, 253-54.) The results of the colonoscopy were normal, but indicated that plaintiff had hemorrhoids. (R. 178-79, 211-25, 253-54, 285.)

On June 8, 2005, plaintiff was seen in the primary care clinic at New York Hospital Medical Center of Queens. (R. 250-52.) She complained of bilateral Achilles pain. (R. 250.) On examination her tendons were tender and swollen. (R. 250.) The physician recommended that plaintiff continue taking Synthroid for her hypothyroidism and Caltrate for her osteoporosis. (R. 251.) It was noted that plaintiff's cervical dystonia had in the past been treated unsuccessfully with Botox treatment, and a trial of Baclofen was recommended. (R. 251.)

Plaintiff returned to the primary care clinic on September 2, 2005 for lab results and reported that she was not experiencing any problems. (R. 256.) She was told that her thyroid function was within normal limits and she should continue to take Synthroid. (R. 256.) She was also advised to continue taking Protonix to control her gastrointestinal bleeding and the Mallory-Weiss tear. (R. 256.) She was also given a refill of her prescription for Lunesta for insomnia, "since it seems to be working for the patient." (R. 256.) A treatment note provides that plaintiff

14

"says [she] drinks maybe 2 [times] a week when she goes out." (R. 256.) She was advised by the doctor to stop drinking, and the treatment note mentions consideration for a liver transplant because she still drinks. (R. 256.) On September 6, 2005, a doctor from the primary care clinic called plaintiff to inform her that prior to dental work she would have to take antibiotics prophylactically because of her endocarditis. (R. 258.) On November 30, 2005, plaintiff's prescriptions for Lunesta, Protonix, and Synthroid were renewed and called into the pharmacy by the primary care clinic at New York Hospital Medical Center. (R. 258.)

      B.      <u>Consulting Physician Sources</u>

On February 27, 2006, plaintiff was examined by Dr. Luke Han, a consulting physician. (R. 187.) Plaintiff reported to Dr. Han that she has suffered from cervical dystonia since 1993, which has resulted in her head turning to the left side. (R. 187.) She reported that she experiences constant pain radiating from her neck to her left shoulder, and she sometimes experiences numbness of her fingers. (R. 187.) Plaintiff reported that as a result of her cervical dystonia, she has agoraphobia and feels ashamed to go out in public. (R. 187.) She also reported that she was diagnosed with osteoporosis in 1995, endocarditis in 2005, acid reflux in 2005, and has an underactive thyroid. (R. 187.) Plaintiff informed Dr. Han that in 2005 she had upper gastrointestinal bleeding. (R. 187.) She also stated that she experiences panic attacks. (R. 188.) She reported currently taking the following medications: Protonix, Synthroid, Beelith, Os-Cal, and Lunesta. (R. 188.) She also reported that she "drinks beer, wine, and liquor constantly," "is drinking enough to help her pain," and she smokes one pack of cigarettes per day. (R. 188.)

Dr. Han described that the cervical spine range of motion examination was difficult to perform because plaintiff's head is 90 degrees turned to the left side. (R. 189.) Dr. Han

15

explained that when plaintiff is laying on the examination table, her head is in the midline, and she can do the forward flexion 20 degrees and lateral flexion 20 degrees to the right side. (R. 189.) At other times, plaintiff's head is completely turned to the left side at 90 degrees and she cannot move in the other directions. (R. 189.) Dr. Han found that plaintiff's lumbar spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. (R. 189.) She had full range of motion of her shoulders, elbows, forearms, and wrists bilaterally. (R. 189.) He found that plaintiff had 5/5 strength in her upper and lower extremities, stable joints, no swelling or effusion, intact hand and finger dexterity, grip strength 5/5 bilaterally, and no motor or sensory deficit. (R. 190.) But Dr. Han found scoliosis present and found tenderness on the left side of plaintiff's neck and at the muscle between her neck and left shoulder. (R. 189.)

As part of the consultant's evaluation, chest and lumbar sacral spine x-rays were taken. (R. 190, 192.) Radiologist Pesho S. Kotval reported that plaintiff's chest x-ray film indicated chronic obstructive pulmonary disease ("COPD"). (R. 192.) The x-ray revealed hyperaeration of both lung fields with flattening of the hemidiaphragms and the T10 vertebrae appeared wedged. (R. 192.) The x-ray also revealed that plaintiff's abdominal aorta had wall calcifications osteopenia. (R. 192.)

Following Dr. Han's examination he diagnosed plaintiff with cervical dystonia, scoliosis, history of endocarditis, possible atrial flutter, acid reflux, hypothyroidism, COPD, and "agoraphobia, by history." (R. 190.) He opined that plaintiff "has a restriction for activity requiring the turning of her head. . . . She may have a moderate restriction for activities requiring great exertion such as heavy lifting and carrying." (R. 191.) On March 22, 2006, Dr. Han again

examined plaintiff and performed a pulmonary function test.  The test showed no acute

respiratory distress, no wheezing present, and "normal spirometry."  (R. 194-95.)

III.     The ALJ's Decision

In a written decision dated March 21, 2007, ALJ Edgell declared plaintiff ineligible for

DIB based on her finding that plaintiff did not have a disability within the meaning of the Social

Security Act from March 17, 2000 through the date last insured of December 31, 2005.  (R. 20-

26.)  In her decision, the ALJ applied the five-step evaluation process required under 20 C.F.R. §

404.1520(a).  She first found that plaintiff has not engaged in substantial gainful activity

("SGA") since March 17, 2000, the initial alleged onset date of her disability.  (R. 22.)  The ALJ

next found that plaintiff suffered from four severe impairments as defined in 20 C.F.R. §

404.1520(c): cervical dystonia, scoliosis, alcohol abuse/dependence, and a history of

gastrointestinal bleed.  (R. 22.)  The ALJ found that the medical evidence "does not, however,

establish the existence of any other severe impairment."  (R. 23.)  She found that although

plaintiff had a history of chronic obstructive pulmonary disease, it was not a severe impairment

because spirometry testing yielded normal findings and showed no signs of abnormalities.  (R.

23.)  The ALJ also considered whether plaintiff's agoraphobia and adjustment disorder with

anxiety and depression was a severe impairment and concluded it was not because "there are no

indications symptoms associated with either of these conditions lasted for any continuous twelve

month period at anytime relevant hereto."  (R. 23.)  The ALJ found that through the date last

insured, none of plaintiff's four identified severe impairments, on their own or in combination,

met or medically equaled the criteria for per se disabling conditions as listed in 20 C.F.R. Part

404, Appendix 1, Subpart P.  (R. 24.)

17

As for the impact of plaintiff's identified severe impairments, the ALJ found that plaintiff had a residual functional capacity to perform a "full range of light work" with the exception that she could not engage in any activity that requires frequent head turning. (R. 24-25.) The ALJ elaborated that plaintiff had the functional capacity for lifting light objects and sitting, standing and walking throughout the workday. (R. 24-25.) The ALJ determined that plaintiff is able to perform her past relevant work as a bank manager, which plaintiff described as involving alternating periods of sitting, standing, and walking, and lifting and carrying "about maybe five or ten pounds" on a normal day and at most fifteen pounds. (R. 25-26.) The ALJ explained that plaintiff was able to perform this work for many years after the onset date of her cervical dystonia and therefore plaintiff's head turning was not inconsistent with the job. (R. 26.) The ALJ further explained that the <u>Dictionary of Occupational Titles</u> indicates that the job of bank manager is basically sedentary in nature and therefore plaintiff retains the capacity to perform the job of bank manager as the job exists throughout the national economy. (R. 26.) Thus, according to the ALJ, plaintiff was not disabled. (R. 26.)

## DISCUSSION

I.    <u>Standard of Review</u>

This case comes to the court for review of the Commissioner's decision that the plaintiff is not disabled.

> Under the Social Security Act, a "disability" is defined as inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1).  An individual is considered to be under a "disability" if his impairment is of such severity that he is unable to perform his previous work and, given his age, education, and work experience he is not able to engage in any other type of substantial gainful employment in the national economy.  See 42 U.S.C. § 423(d)(2)(A).  In determining whether an individual is disabled, the Commissioner is to consider both objective and subjective factors, including "objective medical facts, diagnoses or medical opinions based on such facts, subjective evidence of pain and disability testified to by the claimant or other witnesses, and the claimant's educational background, age, and work experience."  Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980) (citations omitted).

In order to establish disability under the Act, a claimant must prove that (1) he is unable to engage in substantial gainful activity by reason of a physical or mental impairment expected to result in death or that had lasted or could be expected to last for a continuous period of at least twelve months; and (2) the existence of such impairment was demonstrated by medically acceptable clinical and laboratory techniques.  42 U.S.C. §§ 423(d), 1382a(a); see also Shin v. Apfel, No. 97-CV-8003, 1998 WL 788780 at *5 (S.D.N.Y. Nov. 12, 1998) (citing cases).

The SSA has promulgated a five step process for evaluating disability claims.  See 20 C.F.R. § 404.1520.  The Second Circuit has characterized this procedure as follows:

> "First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful employment.  If he is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . .  Assuming the claimant does not have a listed impairment, the

fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform."

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)) (brackets and alteration in original). The inquiries at steps four and five follow from the Commissioner's determination of the claimant's residual functional capacity ("RFC"). See 20 C.F.R. §§ 404.1520(a)(4)(iv)-(v). The plaintiff has the burden of establishing disability on the first four steps of this analysis. On the fifth step, however, the burden shifts to the Commissioner. See Bluvband v. Heckler, 730 F.2d 886, 891 (2d Cir. 1984).

The court's role in reviewing the decisions of the Social Security Administration is narrowly confined to assessing whether the Commissioner applied the correct legal standards in making his determination and whether that determination is supported by substantial evidence. See 42 U.S.C. §§ 405(g); Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987); Donato v. Secretary, 721 F.2d 414, 418 (2d Cir. 1983). Substantial evidence is defined as "more than a mere scintilla[:]" it is evidence that a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971) (citation omitted). "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Snell v. Apfel, 177 F.3d 128, 132 (2d Cir. 1999). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [the court] will not substitute [its] judgment for that of the Commissioner."

Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); see also 42 U.S.C. § 405(g) ("The findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive.").

II.     Review of the ALJ's Decision

By letter brief submitted one day prior to plaintiff's hearing before the ALJ, plaintiff's attorney requested an amendment of the disability onset date to November 1, 2005. At the start of the hearing, in plaintiff's presence, the ALJ stated on the record that she had received the letter from plaintiff's attorney and that she would amend the alleged onset date of disability to November 1, 2005 as requested. In plaintiff's opposition to defendant's motion, she alleges that her disability onset date is and always has been March 17, 2000, and she asserts that her attorney amended the onset date without her "knowledge or consent." (Pl's Second Mem. In Opp. at 2.)

As an initial matter, the court finds that had the ALJ limited her review of plaintiff's claim for DIB to the period from November 1, 2005 through her date last insured of December 31, 2005, the ALJ would not have erred. Plaintiff's attorney's request to amend the period under review was within his authority. See 20 C.F.R. § 416.1510(a)(3)-(4) (in the context of nearly identical Supplemental Security Income proceedings, a claimant's representative may "[m]ake statements about facts and law . . . [and m]ake any request or give any notice about the proceedings"). Absent a showing that plaintiff was coerced or deceived into stipulating to an amended disability onset date, plaintiff's attorney's conduct is imputed to plaintiff. See Zabala v. Astrue, No. 08-0928-cv, 2010 WL 455480, at *5 (2d Cir. Feb. 11, 2010) (citing 20 C.F.R. § 416.1540(c)(1)). Although plaintiff's assertion that she was not informed that her attorney would seek an amendment of the disability onset date is troubling, it does not amount to coercion or deceit. In support of her claim, plaintiff asserts that on the morning of the hearing her attorney

forced her to sign papers without explaining their contents, but this assertion is irrelevant because her attorney submitted the letter requesting amendment the day before. Furthermore, plaintiff was present at the hearing when the ALJ addressed the requested amendment of the onset date and plaintiff had the opportunity to state her objection to the amendment at that time but did not. Therefore, it would have been proper for the ALJ to limit her review to the period beginning November 1, 2005, and had she done so, this court would have found her decision that plaintiff was not disabled during that period to be supported by substantial evidence. The record is devoid of any proof indicating that plaintiff was unable to perform work related activities during this two month period, as the only medical evidence in the record relating to this period is a notation that on November 30, 2005 renewals of plaintiff's prescriptions for Lunesta (for insomnia), Protonix (for acid reflux), and Synthroid (for hypothyroidism) were called into a pharmacy.

However, the ALJ did not limit her review to the amended alleged period of disability, and instead reviewed whether plaintiff was under a disability at any time from March 17, 2000 through the date last insured of December 31, 2005. Thus, in assessing whether the Commissioner applied the correct legal standards and whether his determination is supported by substantial evidence, this court must review whether plaintiff was under a disability during the longer period considered by the ALJ.

Plaintiff challenges the decision of the ALJ on the basis that it is not supported by substantial evidence. The court has considered the arguments made by plaintiff's attorney to the Appeals Counsel that the ALJ erred by (1) finding that plaintiff did not have a "severe" mental impairment at step two; (2) failing to credit plaintiff's testimony as to the severity of her impairments; and (3) failing to determine plaintiff's residual functional capacity. (R. 399.) The

court has also considered plaintiff's pro se arguments to this court that newly submitted evidence – the front pages of Dr. Marin's double-sided treating notes that are already in the record, a letter from Dr. Marin, and a letter from Dr. Wael Kamel – necessitate reversal of the Commissioner's decision. (Pl's First Mem. In Opp.; Pl's Second Mem. In Opp.) For the reasons that follow, the ALJ's decision that plaintiff was not under a disability from March 17, 2000 through the date last insured is supported by substantial evidence and resulted from the proper application of legal standards.

A.    The ALJ Correctly Found Plaintiff Did Not Have A "Severe" Mental Impairment

Plaintiff argues that the ALJ erred by determining at step two that she did not have a "severe" mental impairment because the record contains evidence that plaintiff suffered from agoraphobia.

The regulations define a "severe impairment" as an impairment "which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c); see Bowen v. Yucker, 482 U.S. 137 (1987).[6] In contrast, the regulations define a "non-severe impairment" as an impairment "that does not significantly limit [a claimant's] physical or mental ability to do basic work activities," which include "[p]hysical functions" as well as "use of judgment," [r]esponding appropriately to supervision, co-workers and usual work situations," and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(a)-(b). The Social Security Administration has clarified that "[a]n impairment . . . is found 'not severe' .

---

[6] The Supreme Court recognized that "[t]he severity regulation increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found disabled even if their age, education, and experience were taken into account." Bowen v. Yucker, 482 U.S. 137, 153 (1987).

. . when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were considered." S.S.R. 85-28, 1985 WL 56856, at *3. All medical impairments – physical and mental – must "be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." 20 C.F.R. § 404.1508; see also id. § 404.1520a. Once the existence of a mental impairment is established, its severity is evaluated by assessing the extent that the impairment interferes with a claimant's ability to function independently, appropriately, effectively, and on a sustained basis. See 20 C.F.R. § 404.1520a.

The ALJ properly applied these legal standards when she found, first, that the medical record did not support a finding that plaintiff exhibited symptoms of either agoraphobia or adjustment disorder with anxiety and depression for a continuous twelve month period at anytime during the alleged period of disability, and, second, that plaintiff had no functional limitations on her ability to work as a result of a mental impairment for any continuous twelve month period. See R. 23. Although the record contains evidence that between March 2000 and March 2002 plaintiff at times expressed to Dr. Marin that she was experiencing anxiety and panic attacks and she was prescribed Paxil and Valium to control her symptoms, the record also contains evidence that on February 26, 2002, plaintiff reported to Dr. Cohen, of the psychiatry service at New York Hospital Medical Center that her panic attacks are "totally controlled" with the medication Paxil. See R. 372. On February 26, 2002, Dr. Cohen rated plaintiff's GAF at 90,[7] and assessed that she

---

[7] GAF rates overall psychological functioning on a scale of 0 to 100. Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. 2000) ("DSM-IV"). A GAF rating of 81-90 indicates "absent or minimal symptoms, . . . good functioning in all areas, interested and

24

was oriented times three, cooperative, had a pleasant mood, had clear and coherent thoughts, and had no delusions, no hallucinations, and no suicidal ideations.  <u>See</u> R. 372.  Plaintiff's admission that her panic attacks were "totally controlled" with medication and Dr. Cohen's assessing plaintiff's GAF at 90 are strong record evidence that plaintiff's panic attacks had no impact on her ability to function independently, appropriately, and effectively on a sustained basis during this period.

Furthermore, in April 2005 plaintiff informed medical personnel at New York Hospital Medical Center that she last experienced panic attacks two years ago, in 2003.  <u>See</u> R. 233.  The record also indicates that plaintiff last saw Dr. Marin on March 27, 2002, and since she did not see any other doctors until 2005 (with the exception of her October 2002 emergency room visit for rib cage pain), she could not have taken Paxil for very long after March 2002.  Plaintiff also testified at her hearing that she previously took Paxil in 2002, <u>see</u> R. 426, indicating that plaintiff was not taking medication for panic attacks and did not feel the need to after 2002.  Plaintiff also reported to a doctor at New York Hospital Medical Center's primary care clinic in September 2005 that she drinks alcohol about two times a week "when she goes out," <u>see</u> R. 256, and she testified that she made trips to England to visit family in August 2001 and around Christmas-time in 2004, <u>see</u> R. 426, 434.  First, this evidence indicates that even though plaintiff at times experienced panic attacks and asserts that she has agoraphobia, her symptoms did not continue for a twelve month duration at any time after March 2002 and prior to March 2002 the attacks were controlled by medication.  Second, the evidence indicates that plaintiff's mental impairment

---

involved in a wide range of activities, socially effective, generally satisfied with life, [and] no more than everyday problems or concerns."  <u>Id.</u> at 34.

was not "severe" as the panic attacks did not significantly limit her ability to engage in activities of daily living, to maintain an adequate level of social functioning, and to maintain concentration persistence and pace. See 20 C.F.R. § 404.1520a. Thus, the ALJ properly applied the correct legal standards to conclude that the record medical evidence did not establish the existence of a severe mental impairment that lasted for a continuous twelve month period.

B.    The ALJ Properly Analyzed Plaintiff's Credibility

Plaintiff argues that the ALJ failed to properly analyze her credibility. (R. 401.) She asserts both that the ALJ's "conclusory statement" that plaintiff's allegations are not credible "to the incapacitating extent alleged" was insufficient and that the ALJ's ultimate finding that plaintiff's testimony was not credible was an error. (R. 401.)

A claimant's statements about his or her condition, and the limitations caused by it, are not enough to establish disability. See 20 C.F.R. § 404.1529; S.S.R. 96-7p, 1996 WL 374186. The Commissioner's regulations require that an ALJ consider a claimant's observable signs and laboratory findings, as well as reported symptoms,[8] when determining whether or not a disability exists within the meaning of the regulations. 20 C.F.R. § 404.1529. To this end, the ALJ must employ a two-step analysis by first determining whether the claimant has medically determinable impairments, "which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(a); see also S.S.R. 96-7p, 1996 WL 374186, at *2. Second, if medically determinable impairments are shown, then the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the

---

[8] "A symptom is an individual's own description of his or her physical or mental impairment(s)." S.S.R. 96-7p, 1996 WL 374186, at *2.

plaintiff's capacity to work.  See 20 C.F.R. § 404.1529(c); S.S.R. 96-7p, 1996 WL 374186, at *2. Because "an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone," S.S.R. 96-7p, 1996 WL 374186, at *3, an ALJ will consider the factors listed in the regulations.[9]  20 C.F.R. §§ 416.929(c)(3)(i)-(vii).

Here, the ALJ properly completed the required two-step analysis.  The ALJ found that medical evidence established that plaintiff had four severe impairments – cervical dystonia, scoliosis, alcohol abuse/dependence, and a history of gastrointestinal bleed – but after considering the evidence in the record, she was "not persuaded that any symptoms that have occurred since the alleged onset date were of such intensity, frequency or persistence as to preclude the performance of low levels of work related functions" and she found plaintiff's complaints were "not credible to the incapacitating extent alleged." (R. 22, 24-25.)  Plaintiff argues that the ALJ did not give appropriate or adequate reasons for discounting her credibility, but the ALJ's decision clearly reveals that she assessed, and then discussed, her credibility findings according to the requirements of 20 C.F.R. §§ 404.1529 and S.S.R. 96-7p.

The ALJ found that plaintiff's cervical dystonia and scoliosis could reasonably be expected to produce some degree of pain, but not to the extent alleged by the plaintiff.  (R. 24.) For example, the ALJ noted that Dr. Han's physical examination of plaintiff revealed that she

_____

[9] The listed factors are: (i) claimant's daily activities; (ii) location, duration, frequency, and intensity of claimant's symptoms; (iii) precipitating and aggravating factors; (iv) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (v) other treatment received to relieve symptoms; (vi) any measures taken by the claimant to relieve symptoms; and (vii) any other factors concerning claimant's functional limitations and restrictions due to symptoms.  20 C.F.R. §§ §§ 416.929(c)(3)(i)-(vii).

retained a full range of motion and normal strength in her upper extremities as well as strong grip and dexterity in her hands. (R. 24.) The ALJ also noted that despite plaintiff's allegations of constant pain, plaintiff relied solely on over-the-counter Advil and alcohol to relieve her pain, and after March 2005 according to her testimony her alcohol intake was limited to only an occasional glass in the evening, "suggesting [the pain] does not occur with debilitating intensity or frequency." (R. 24.) The ALJ also considered that plaintiff worked for many years after being diagnosed with cervical dystonia and only stopped working when her bank was purchased by another bank and she took a "buy-out." (R. 24.) Furthermore, the ALJ considered that in the questionnaire completed by plaintiff in February 2006 she indicated that she was able to perform light household chores such as cooking, cleaning, washing laundry, ironing, shopping, and was able to play internet games on her computer despite her alleged pain and cervical dystonia, which suggests that she "has a greater level of functioning and mobility than contended." (R. 25.) With regard to plaintiff's other severe impairments, the ALJ also considered that plaintiff's one instance of gastrointestinal bleeding had been resolved after treatment and that despite evidence of plaintiff's alcohol dependence, plaintiff testified at the hearing that beginning in 2005 she had only an occasional glass of alcohol in the evenings, and her testimony revealed that her alcohol intake was limited to nights and did not impact her ability to function during daytime hours. (R. 24.)

Thus, the ALJ engaged in a meaningful discussion of the factors before exercising her discretion to evaluate plaintiff's testimony as not entirely credible and rendered an independent judgment regarding the extent of plaintiff's subjective complaints based on the objective medical and other evidence. See, e.g., Mimms v. Sec'y of Health & Human Servs., 750 F.2d 180, 196

(2d Cir. 1984). The court finds that plaintiff's wide and varied activities described in her February 2006 questionnaire as well as her admission in 2005 that she goes out and drinks clearly suggest that her pain is not of the disabling intensity that she asserted. See Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980) ("[Claimant's] testimony showed that despite her pains and shortness of breath, she can cook, sew, wash and shop, so long as she does these chores slowly and takes an afternoon rest. Taken as a whole, appellant's testimony did not preclude the possibility that she could perform gainful activity of a light, sedentary nature."). Furthermore, the ALJ's assessment that plaintiff's testimony about her functional limitations and pain is not entirely credible is supported by other substantial evidence in the record such as the facts that plaintiff was able to travel to England in 2001 and 2004, that despite being referred to a pain specialist and a physical therapist in July 2006 and January 2007 plaintiff had not seen these specialists at the time of the February 2007 hearing, that plaintiff did not seek prescription pain medication between March 2002 and March 2005, and that plaintiff was assessed by medical professionals as independent in activities of daily living on April 1, 2005. Finally, although plaintiff worked for fifteen years and "a good work history may be deemed probative of credibility," see Schaal v. Apfel, 134 F.3d 496, 502 (2d Cir. 1998), work history is "just one of many factors" for the ALJ to consider in weighing the plaintiff's credibility, see id.; see also 20 C.F.R. § 404.1529(c)(3). The ALJ appropriately considered that plaintiff's absence from the workforce was due to her choice to take a "buy-out" rather than a physical or mental inability to continue working.

C.    The ALJ Properly Determined Plaintiff's Residual Functional Capacity

Plaintiff argues that the ALJ erred by failing to determine plaintiff's residual functional capacity. (R. 400-01.) Plaintiff argues that the ALJ found that plaintiff was able to "lift light objects and sit, stand and walk throughout the workday," which plaintiff argues does not correspond to any of the physical exertion levels of work activity listed at 20 C.F.R. § 404.1567 and therefore necessitates remand for a new hearing. (R. 401.) Plaintiff's argument is without merit because although the ALJ did specify that plaintiff retained the above quoted abilities, the ALJ also determined that plaintiff retained "the residual functional capacity to perform a full range of light work" with the exception that her residual functional capacity is compromised by the nonexertional limitation that she is "unable to engage in work activities that involve frequent head turning." (R. 25.) "Light work" is a physical exertion level recognized and defined at 20 C.F.R. § 404.1567(b).

The ALJ properly found that plaintiff retained the residual functional capacity to engage in the full range of light work with the nonexertional limitation that she cannot engage in work activities that involve frequent head turning.

"Disability" is defined as the inability to engage in <u>any</u> substantial gainful employment by reason of any medically determinable impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. <u>See</u> 42 U.S.C. § 423(d)(1)(A). The mere presence of a severe impairment or multiple impairments is insufficient to establish disability; a claimant must present evidence that she has functional limitations resulting from the impairment or combination of impairments that would preclude participation in any substantial gainful activity. <u>See</u> <u>Coleman v. Shalala</u>, 805 F. Supp. 50, 53 (S.D.N.Y. 1995); <u>see also</u> <u>Rivera v. Harris</u>, 623 F.2d 212, 215-16 (2d Cir. 1980). After considering all of the evidence of record

30

pertaining to a claimant's impairments, the ALJ is responsible for determining the claimant's residual functional capacity, which is the "most a claimant can still do despite his or her limitations."  See 20 C.F.R. §§ 404.1545(a)(1), 404.1546.  The ALJ then considers a claimant's residual functional capacity in conjunction with her past relevant work, and if she can still do her past relevant work, she is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(iv).

The court finds that the ALJ did not err when, based on plaintiff's medical and other evidence, she concluded that plaintiff retained the residual functional capacity to engage in the full range of light work with the nonexertional limitation of work activities requiring "frequent head turning," and that plaintiff could still do her past relevant work as a bank manager.  "Light work" is defined as involving:

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involved sitting most of the time with some pushing and pulling of arm or leg controls. . . . If someone can do light work, we determine that he or she can also do sedentary work.

20 C.F.R. § 404.1567(b).  This residual functional capacity is consistent with Dr. Han's assessment that although plaintiff had cervical dystonia and scoliosis, she has only a restriction for "activity requiring the turning of her head" and a "moderate restriction for activities requiring great exertion such as heavy lifting and carrying."  (R. 190-91.)  It is also consistent with the medical evidence indicating that between March 2000 and March 2002 and March 2005 and November 2005 plaintiff primarily had routine doctor's visits, plaintiff took no pain medication, and that despite her severe impairments and other non-severe medical conditions plaintiff's impairments had not restricted her abilities to function in a work environment.  For example, in

April 2005, plaintiff reported that she was independent in her activities of daily living, and although in 2005 plaintiff was diagnosed with dilation of the right kidney and had a Mallory-Weiss tear, no doctor ever opined that plaintiff was functionally limited by these diagnoses.[10] The residual functional capacity assessment is also consistent with plaintiff's decision not to seek medical treatment for any impairments for the three year period from March 2002 to March 2005, during which she took only over-the-counter Advil for pain.  As discussed above, plaintiff's testimony about the extent of her functional limitations was not credible.  There is no medical or other evidence in the record to indicate that plaintiff could not do a good deal of walking, standing, or sitting, and carry up to ten pounds during the period of March 17, 2000 to December 31, 2005.  Plaintiff wrote in the questionnaire that she completed in February 2006 that she used the computer almost daily, watched television (which likely involved sitting), and was able to perform light household chores that involve standing and walking, such as cooking, cleaning, dusting, ironing, and washing laundry.

On the question of whether plaintiff was able to perform her past relevant work, plaintiff described her position at the bank as involving sitting at a desk for half of the day, standing and/or walking for half of the day, and lifting or carrying "about maybe five or ten pounds" on a normal day.  The Dictionary of Occupational Titles identifies the job of bank manager as basically sedentary in nature and involving lifting of only light objects weighing up to ten pounds.  As discussed above, plaintiff's medical and other evidence failed to establish functional

---

[10] In addition, although plaintiff was advised that she had endocarditis in September 2005, the record indicates only that as a result of the condition plaintiff would have to take antibiotics prophylactically prior to a dental procedure, and there is no evidence in the record that plaintiff's condition was functionally limiting.

limitations of such magnitude that she would be precluded from participation in her past relevant work. Plaintiff's inability to engage in work activities that involve frequent head turning would not prevent her from being able to perform her past relevant work as a bank manager. Plaintiff's cervical dystonia, with which she was diagnosed in 1993, did not prevent her from working at the bank for more than seven years after her diagnosis, and plaintiff testified that it was the offer of a "buy-out" and not her worsening cervical dystonia that caused her to stop working. The ALJ's determination is supported by substantial evidence.

       D.    <u>Remand To Consider New Evidence Not Appropriate</u>

Plaintiff argues that her newly submitted evidence that was not part of the record before the ALJ – the front pages of Dr. Marin's double-sided treating notes that are already in the record, a letter from Dr. Marin dated February 17, 2010, and a letter from Dr. Wael Kamel dated March 1, 2010 – necessitate reversal of the Commissioner's decision. (Pl's First Mem. In Opp.; Pl's Second Mem. In Opp.) The Social Security Act provides that a court may remand a case to the Commissioner to consider additional evidence, but only if the evidence is new, material, and there is good cause for failure to incorporate the evidence into a prior proceeding. 42 U.S.C. § 405(g) (sixth sentence). To obtain a remand the following three part test must be satisfied: (1) the evidence is new and not merely cumulative of what is already in the record; (2) the evidence is material, meaning it is both relevant to the claimant's condition during the time period for which benefits were denied and there is a reasonable probability that the new evidence would have influenced the Commissioner to decide the claimant's application differently; and (3) there is good cause for failure to produce the evidence earlier. <u>See</u> <u>Tirado v. Bowen</u>, 842 F.2d 595, 597 (2d Cir. 1988); <u>see also</u> <u>Jones v. Sullivan</u>, 949 F.2d 57, 60 (2d Cir. 1991); <u>Lisa v. Sec. of</u>

Dep't of Health & Human Servs., 940 F.2d 40, 43 (2d Cir. 1991). Plaintiff fails to meet the statutory requirements for any of the three pieces of new evidence.

Remand is not appropriate based on the front pages of Dr. Marin's double-sided treating notes because the majority of the front pages contain information that is merely duplicative of the information on the back pages already in the record. The information on the front pages that is not entirely duplicative merely confirms that plaintiff saw Dr. Marin for routine doctor's appointments and had been diagnosed with the medical conditions known to the ALJ such as dystonia, torticollis, anxiety, osteoporosis, hypothyroidism, and bronchitis. There is not a reasonable possibility that the front page information that is not duplicative of the back pages in evidence would have influenced the Commissioner to decide plaintiff's application differently. For example, the March 2, 2002 front page notes that Dr. Marin suggested that plaintiff visit a psychiatrist, and the December 1, 2000, January 24, 2001, and November 7, 2001 front pages note that plaintiff reported feeling anxiety. However, the ALJ was aware that Dr. Marin had prescribed plaintiff Paxil and Valium for her anxiety, and a mere suggestion that plaintiff visit a psychiatrist is not substantial evidence that plaintiff had a severe mental impairment that limited her functional capacity.

Remand is also not appropriate based on Dr. Marin's letter, ninety-five percent of which is a typed compilation of the treatment notes already in the record. See Pl.'s Second Mem. In Opp. Ex. 1 at 1 ("The dictated report today relies on copies of medical records that the plaintiff brought to our office."). The only new evidence in Dr. Marin's 2010 letter is the last sentence stating: "I have independent recollection that through the course of treatment over the years, the patient had severe spastic torticollis which prevented her from living a normal life and pursuing

her normal activities of daily living." Pl.'s Second Mem. In Opp. Ex. 1 at 3. Dr. Marin's letter did not include an assessment of plaintiff's functional capacity to work during the time she was his patient from August 1999 to March 2002. The final sentence of his letter does not indicate whether he believed plaintiff was limited in her ability to perform light or sedentary work. Therefore, there is not a reasonable probability that this new evidence would have influenced the Commissioner to decide the claimant's application differently.

Finally, remand is not appropriate based on the letter from Dr. Kamel because the letter states that plaintiff has been under Dr. Kamel's care since July 2008, which is nearly three years after plaintiff's date late insured. Dr. Kamel's letter is therefore not relevant to the plaintiff's condition during the time period for which benefits were denied. In addition, plaintiff has failed to allege good cause for failure to produce any of the new evidence earlier. Remand to the Commissioner based on the new evidence provided is not appropriate.

## CONCLUSION

For the reasons set forth above, the ALJ correctly applied the appropriate legal standards and there was substantial evidence supporting the Commissioner's decision that plaintiff was not disabled at any time through December 31, 2005. The defendant's motion for judgment on the pleadings is granted and plaintiff's motion seeking reversal of the Commissioner's decision is denied. The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.

/s/ ARR

_____
Allyne R. Ross
United States District Judge

Dated:  August 30, 2010
        Brooklyn, New York

SERVICE LIST:

*Pro Se Plaintiff*
Patricia Klos
60-03 138th Street
Flushing, NY  11355


*Social Security Administration*
Scott R. Landau, Esq.
United States Attorney's Office
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY  11201